*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEONARD F. JOBE,

*Plaintiff-Appellant,*

No. 04-5222

*v.*

CITY OF CATLETTSBURG,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 02-00129—Henry R. Wilhoit, Jr., District Judge.

Argued: February 2, 2005

Decided and Filed: May 6, 2005

Before: NELSON and SUTTON, Circuit Judges; WELLS, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** David A. Friedman, AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, Louisville, Kentucky, for Appellant. Matthew J. Wixsom, Ashland, Kentucky, for Appellee. **ON BRIEF:** David A. Friedman, AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, Louisville, Kentucky, Edward E. Dove, DOVE LAW OFFICE, Lexington, Kentucky, for Appellant. Matthew J. Wixsom, Ashland, Kentucky, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. May a city, consistent with the First and Fourteenth Amendments, prohibit individuals from placing leaflets on car windshields and other parts of a vehicle without the consent of the owner? Because the law represents a content-neutral restriction on the time, place and manner of speech, because the law narrowly regulates the problems at hand (littering, visual blight and unauthorized use of private property), because the law leaves open ample alternative avenues for distributing leaflets in an inexpensive manner (face-to-face on a public street and door-to-door in a neighborhood) and because the law has much in common with a ban on placing signs on utility poles, *see Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), we conclude that it may.

_____

[*] The Honorable Lesley Wells, United States District Judge for the Northern District of Ohio, sitting by designation.

1

I.

The City of Catlettsburg lies in northeastern Kentucky at the confluence of the Ohio and Big Sandy rivers, where the borders of Kentucky, Ohio and West Virginia all converge. The city has a population of about 1,900.

In 1952, the city council of Catlettsburg enacted the following ordinance:

> *§ 113.05  Placing Posters on Vehicles*
> It shall be unlawful for any person to place or deposit or in any manner to affix or cause to be placed or deposited or affixed to any automobile or other vehicle or other automotive vehicle, any handbill, sign, poster, advertisement, or notice of any kind whatsoever, unless he be the owner thereof, or without first having secured in writing the consent of the owner thereof.
> Penalty, see § 113.99

Catlettsburg, Ky., City Ordinances, § 113.05. The ordinance thus prohibits individuals from doing two different things—"plac[ing]" a handbill on a car (e.g., under the windshield wipers) or "affix[ing]" a poster or other advertisement to the car. Individuals who violate the section may be fined "not more than $500." *See* § 113.99.

The ordinance does not stand alone in the city's code. In a neighboring law, entitled "Scattering, Littering Prohibited," the city forbids throwing, scattering, or distributing any poster or pamphlet upon any public place (including sidewalks and streets), upon "any private lot or steps," or "into or upon . . . any vehicle." *See* § 113.03. At the same time, the city expressly permits the distribution of written materials to private residences if the literature "is handed in at the door, or placed on a porch, or securely fastened to prevent it from being blown or scattered about," *id.*, and the city does not prohibit individuals from handing out leaflets on streets, sidewalks or other public places.

The current mayor of Catlettsburg does not know why the city first promulgated the vehicle-handbill ordinance over a half-century ago. As for the present-day relevance of the ordinance, the mayor has explained that the municipality has a general littering problem that this ordinance (along with other ordinances) helps to address.

Leonard Jobe lives in Catlettsburg and is the head of the local American Legion post. In 2002, Jobe, with no apparent knowledge of the law, began distributing leaflets on behalf of the American Legion by placing them under the windshield wipers of cars parked on public property. In response, the city enforced the ordinance against him by fining Jobe $500. Jobe has paid the fine and does not challenge its imposition here. As far as the mayor can recall (based on his employment with the city since 1991), Jobe was the first person against whom the city has enforced the ordinance. To the mayor's knowledge, no one had complained about leafletters violating the ordinance before Jobe's violation and no one has complained about leafletting of this sort since then.

Invoking his First (and Fourteenth) Amendment right to freedom of speech, Jobe filed a three-page declaratory-judgment action against the city, seeking a declaration that the ordinance was unconstitutional, an injunction against the ordinance as applied to future leafletting by him and an award of costs and attorney's fees. On cross motions for summary judgment and after minimal discovery initiated by the parties, the district court upheld the ordinance as a valid content-neutral time, place and manner restriction that did not foreclose other means of effective communication. We review the district court's grant of summary judgment de novo. *CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365, 368 (6th Cir. 2005).

II.

A.

In its traditional form, leafletting occurs when individuals offer handbills, pamphlets, tracts, advertisements, notices and other information to individuals on the street or sidewalk who remain free to accept or reject the document. *Taxpayers for Vincent*, 466 U.S. at 809–10 ("The [leafletting] right recognized in *Schneider* [*v. New Jersey*, 308 U.S. 147 (1939),] is to tender the written material to the passerby who may reject it or accept it, and who thereafter may keep it, dispose of it properly, or incur the risk of punishment if he lets it fall to the ground."). It is a venerable and inexpensive method of communication that has permitted citizens to spread political, religious and commercial messages throughout American history, starting with the half a million copies of Thomas Paine's *Common Sense* that fomented the American Revolution. *See Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (noting that "pamphlets and leaflets . . . have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest"); *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943) ("The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses."). *See also Watchtower Bible & Tract Soc'y of New York v. Vill. of Stratton*, 536 U.S. 150, 153 (2002) (religious speech); *Hill v. Colorado*, 530 U.S. 703, 716 (2000) (political speech); *Breard v. Alexandria*, 341 U.S. 622, 624 (1951) (commercial speech); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993) (commercial speech).

In each of these settings, the Supreme Court has made it clear that leafletting and related activities represent a method of speech protected by the First and Fourteenth Amendments. The Court has invalidated bans on leafletting on public streets. *See, e.g.*, *United States v. Grace*, 461 U.S. 171, 183–84 (1983) (striking statute forbidding leafletting on the sidewalks surrounding the Supreme Court); *Jamison v. Texas*, 318 U.S. 413, 414 (1943) (striking ordinance forbidding leafletting on public streets); *Schneider*, 308 U.S. at 162–63 (striking ordinances forbidding leafletting on public streets). It has invalidated bans on door-to-door leafletting, where individuals offer the homeowner informational tracts at the same time that they try to engage the homeowner about the religious, political or commercial message they wish to convey. *See, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 149 (1943) (striking ordinance that forbade ringing a doorbell or otherwise summoning a resident to the door to receive handbills); *Schneider*, 308 U.S. at 165 (striking ordinance that forbade door-to-door leafletting). And it has invalidated licensing requirements for door-to-door solicitors and leafletters. *See Watchtower Bible & Tract Soc'y of New York*, 536 U.S. at 168 (striking ordinance prohibiting canvassers from going door-to-door among residences without a permit because it was "not tailored to the Village's stated interests"); *Lovell*, 303 U.S. at 451 (striking ordinance prohibiting "the distribution of literature of any kind at any time, at any place, and in any manner without a permit").

At the same time that the Court has invalidated bans on leafletting and unyielding licensing requirements for leafletting, it has indicated that the reserved police powers of the States (and cities) permit them to impose reasonable time, place and manner restrictions on leafletting. *See Frisby v. Schultz*, 487 U.S. 474, 488 (1988) (upholding ban on leafletting in front of a targeted residence); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654–55 (1981) (upholding regulation restricting leafletting at a state fair to assigned booths); *Hill*, 530 U.S. at 723 (upholding regulation prohibiting leafletters within 100 feet of a health care facility from knowingly coming within eight feet of another person without first receiving that person's consent); *cf. Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 380 (1997) (upholding injunction creating fixed buffer zones that prevented leafletters and protestors from approaching within 15 feet of health clinic doorways).

The Court also has addressed similar free-speech issues in the context of government regulations of signs. In *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 513–15 (1981), the Court invalidated a city ordinance that placed substantial restrictions on billboards within the city because the restrictions were content-based. In *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), the Court invalidated an ordinance that prohibited "homeowners from displaying any signs on their property except 'residence identification' signs, 'for sale' signs, and signs warning of safety hazards," *id.* at 45, because the ordinance "almost completely foreclosed a venerable means of communication that is both unique and important," *id.* at 54. And in *Taxpayers for Vincent*, the Court upheld a Los Angeles ordinance that banned posting signs on publicly owned utility poles because the ordinance "responds precisely to the substantive problem which legitimately concerns the City" while "curtail[ing] no more speech than [was] necessary to accomplish its purpose." 466 U.S. at 810. In each of these settings, the Court has explained that the right to distribute literature protects both the interests of speakers in sharing information and the interests of citizens in receiving it. *See Martin*, 319 U.S. at 146–47 ("Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved."); *id.* at 143 (explaining that the freedom of speech "necessarily protects the right to receive [literature]" and considering "the right of the individual householder to determine whether he is willing to receive" a leafletter's message); *see also Gilleo*, 512 U.S. at 56; *Taxpayers for Vincent*, 466 U.S. at 812 n.30; *Schneider*, 308 U.S. at 164.

Through it all, however, the Court has not considered the validity of a regulation restricting individuals from placing leaflets on car windshields or otherwise affixing notices on cars. That is surprising given the many cities that have similar ordinances. As readers outside of Catlettsburg may wish to know, one State (New York) and numerous American cities have adopted equivalent ordinances, including many large cities (Atlanta, Philadelphia), several mid-sized cities (Charlotte, Portland (Oregon), San Antonio) and some small cities (Albany (Georgia), Mundelein (Illinois), Mishawaka (Indiana)). *See* Appendix (listing similar ordinances from one State, from one territory and from 38 cities located in 19 other States). One of the four statutes at issue in *Schneider* (the Los Angeles statute), it is true, forbade "attach[ing] any hand-bill in, to or upon any automobile or other vehicle." 308 U.S. at 154. But the Court never mentioned the provision in its analysis and, after addressing Clara Schneider's as-applied challenge to her conviction under a New Jersey licensing requirement for door-to-door advocacy, reversed the conviction of another appellant charged under the Los Angeles ordinance for distributing handbills on a sidewalk without giving any indication that his challenge was not an as-applied challenge as well. *See id.* at 165 ("We do hold, however, that the ordinance in question, *as applied to the petitioner's conduct*, is void, and she cannot be punished for acting without a permit. The judgment in each case is reversed and the causes are remanded for further proceedings not inconsistent with this opinion.") (emphasis added).

B.

In the face of these precedents and this history, both parties agree that the First Amendment generally protects leafletting in its various forms and manifestations. And they agree that the Catlettsburg ordinance is a content- and viewpoint-neutral regulation of leafletting, and thus does not warrant exacting scrutiny on that basis alone. But they part company over whether Jobe's leafletting occurred in a public forum—with Jobe emphasizing that his leafletting occurred on cars parked on public streets and the city emphasizing that his leafletting occurred on privately owned cars.

The public-forum doctrine recognizes "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). The traditional public forum consists of "government property that has traditionally been available for public expression," such as public

streets and parks. *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992); *Cornelius*, 473 U.S. at 802. The designated public forum consists of public property "that the State has opened for expressive activity by part or all of the public." *Lee*, 505 U.S. at 678. "[A]ll remaining public property" falls into the third category, the nonpublic forum. *Id.* at 678–79. With respect to a traditional public forum and a designated public forum, "the government may not prohibit all communicative activity," may only enforce content-based restrictions when it shows "that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end" and "may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *id.* at 46. Regulations concerning nonpublic fora, however, face less daunting scrutiny: They "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Lee*, 505 U.S. at 679.

Not every regulation that affects public property, however, implicates the public-forum doctrine. In *Taxpayers for Vincent*, supporters of a political candidate challenged a Los Angeles ordinance that prohibited them from placing cardboard signs on utility poles and crosswires supporting utility poles. 466 U.S. at 792–93. In addressing their as-applied challenge to the law, *id.* at 803, the Court observed "that 'the First Amendment does not guarantee access to government property simply because it is owned or controlled by the government.'" *Id.* at 814 (quoting *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)). It then reasoned that the supporters' "reliance on the public forum doctrine [was] misplaced" because they had "fail[ed] to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks." *Id.* at 814. Even though the utility poles were "publicly owned objects," *id.* at 801, and even though they were situated along public streets and on public sidewalks, the Court concluded that the utility poles were not public fora and that the law was "certainly constitutional," *id.* at 815.

Similar reasoning defeats Jobe's argument. If the public-forum doctrine does not apply to *public* items (e.g., utility poles) *permanently* located on public streets and sidewalks, it assuredly does not apply to *private* cars *temporarily* parked on public streets. And if *Taxpayers for Vincent* was wary about permitting citizens to co-opt utility poles to serve as bulletin boards and signposts, one would expect the Court to be equally wary, if not more wary, of permitting citizens to co-opt privately owned cars to serve as receptacles for the distribution or display of literature and other information. *See id.* at 815 n.31 (noting that "appellees could not seriously claim the right to attach 'Taxpayer for Vincent' bumper stickers to city-owned automobiles" and reiterating that "the State, '*no less than a private owner of property*, has power to preserve the property under its control for the use to which it is lawfully dedicated'") (emphasis added). In neither of these settings, whether the utility pole or the car, does the ostensible public forum deal with a method of communication for which one can say there has been a "traditional right of access" and in neither instance does it offer an apt analogy to the forms of communication that have long taken place on our "public streets and parks." *Id.* at 814. *See also Council of Greenburgh*, 453 U.S. at 128–30 (concluding that letterboxes for mail were not public fora and rejecting claim of First Amendment right to place leaflets in letterboxes without paying postage); *id.* at 131 ("[I]t is a giant leap from the traditional 'soapbox' to the letter-box designated as an authorized depository of the United States mails, and we do not believe the First Amendment requires us to make that leap."). In the final analysis, Jobe is mistaken in claiming that the city has regulated a public forum.

C.

Once *Taxpayers for Vincent* had concluded that the ordinance at issue did not regulate a public forum, it proceeded to apply the traditional time-place-and-manner test to the regulation. 466 U.S. at 808, 815. Following the Court's lead, we will do the same. While one could argue that the protection of private property rights here calls for a lower standard of review, *see id.* at 811 (noting that in *Metromedia* "the private citizen's interest in controlling the use of his own property justifie[d]" treating differently signs on private versus public property), that argument has not been made.

To qualify as a reasonable time-place-and-manner regulation of speech, the law must (1) be content-neutral, (2) serve a significant government interest, (3) be narrowly tailored to serve that government interest and (4) leave open ample alternative channels of communication. *Id.* at 808, 815; *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 818 (6th Cir. 2005); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 751–52 (6th Cir. 2004). Under the third requirement, as the Supreme Court has "emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill*, 530 U.S. at 726. "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (quotations omitted); *Prime Media*, 398 F.3d at 819.

Catlettsburg's ordinance survives this test. *First*, the parties correctly agree that the ordinance is content-neutral and viewpoint-neutral as well. The law does not draw distinctions based on the topic of speech at issue or the point of view of the speaker. And the explanations for passing the law have nothing to do with the content of the literature being distributed by the speaker. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

*Second*, the ordinance advances two significant government interests: (1) It furthers the government's interest in prohibiting litter and visual blight; and (2) it furthers individuals' interests in having their private property left alone by those who do not have permission to use it. Curbing littering and the visual blight that comes with it advances the city's "weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Taxpayers for Vincent*, 466 U.S. at 806; *see also Metromedia*, 453 U.S. at 507–08 (four-justice plurality) ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial governmental goals. It is far too late to contend otherwise."); *id.* at 552 (Stevens, J., dissenting in part) (stating that the interests "in maintaining pleasant surroundings and enhancing property values . . . are equally legitimate and substantial in all parts of the city"); *id.* at 560 (Burger, C.J., dissenting) ("The plurality acknowledges—as they must—that promoting traffic safety and preserving scenic beauty 'are substantial government goals.'"); *id.* at 570 (Rehnquist, J., dissenting) ("In my view, the aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community."). Allowing individuals to decide for themselves how, when or whether their private property is used either for a public advertisement (e.g., the affixing of a poster on a car) or as a container for an advertisement (e.g., placing a leaflet under the car windshield wipers) is a legitimate, if not compelling, government interest. *See Lloyd Corp. v. Tanner*, 407 U.S. 551, 570 (1972) ("[T]he Fifth and Fourteenth Amendment rights of private property owners . . . must be respected and protected."); *id.* at 567 ("It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech.").

Nor does Catlettsburg stand alone in seeking to advance these government interests. That at least one State (New York) and at least 38 other cities—from Philadelphia and Atlanta to San Antonio and Portland (Oregon) to Mishawaka (Indiana) and Albany (Georgia)—have passed similar laws suggests that the policy behind them is premised on legitimate rather than contrived police-power concerns. *See* Appendix. In view of the common-sense explanations for these types of laws, they do not invariably require proof that the problem has occurred in the past (a daunting task in view of the 1952 vintage of this law and the understandable absence of information about why the law was passed) or an elaborate study of their present-day necessity (an equally daunting task in view of the difficulty of showing the empirical necessity for a law that has been in place for more than 50 years). While governments normally should be expected to weigh the costs and benefits of regulating methods of speech as well as the alternative to regulating speech at all before enacting such laws, *Prime Media*, 398 F.3d at 823, it hardly amounts to speculation to conclude that the First Amendment costs of this law are quite modest (given the inexpensive alternatives available for distributing literature or advertisements) and the police-power benefits of the law are quite legitimate (given the private-property and aesthetic interests advanced by the law).

Nor, at any rate, has Jobe presented "any reason to question the city's theory" that a ban on placing advertisements and posters on cars will further the city's interest in preventing littering on private property and in preventing the use of private property for purposes neither intended nor welcomed by the owner. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437–40 (2002). *See also Metromedia*, 453 U.S. at 510 (plurality) ("It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'"); *Taxpayers for Vincent*, 466 U.S. at 816–17 ("[W]e accept the City's position that it may decide that the esthetic interest in avoiding 'visual clutter' justifies a removal of signs creating or increasing that clutter."); *Prime Media*, 398 F.3d at 824 (rejecting the contention that a city should have to justify specific dimensional restrictions on billboards "because any further explanation assuredly would contain the kind of aesthetic and subjective judgment that judges are not well-equipped to second guess").

*Third*, the ordinance advances these interests in a narrow and constitutionally permissible way. As in *Taxpayers for Vincent*, where Los Angeles banned "the posting of signs on public property," 466 U.S. at 791, "the substantive evil" at issue—visual blight there, littering on private property here—

> is not merely a possible by-product of the activity, but is created by the medium of expression itself. In contrast to *Schneider*, therefore, the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City. The ordinance curtails no more speech than is necessary to accomplish its purpose.

*Id.* at 810. "By banning these signs," the Court concluded, "the City did no more than eliminate the exact source of the evil it sought to remedy." *Id.* at 808.

So it is true here. Catlettsburg targeted the precise problems—littering on private automobiles and unauthorized use of private property—that it wished to correct. If a city may ban signs from utility poles due to the visual blight caused by them, it follows that a city may ban the placement of leaflets and signs on privately owned cars. For the Catlettsburg law not only corrects the visual blight stemming from all manner of unrequested advertisements being placed on cars, it also prevents littering on private property (e.g., on the privately owned cars), prevents littering on public property (when wind, rain or the inadequacy of a windshield wiper as a receptacle for information causes the leaflets to fall to the ground) and prevents private property from being co-opted for uses that the owner neither intended nor welcomed.

*Fourth*, the ordinance leaves open ample alternative channels of communication. Placed in the context of other municipal laws enacted by the city, the ordinance permits a wide range of leafletting activities. Catlettsburg does not prohibit leafletting in its most traditional sense—offering handbills to pedestrians and giving them the choice to take the handbill or leave it. *See Taxpayers for Vincent*, 466 U.S. at 809–10 ("The [leafletting] right recognized in *Schneider* is to tender the written material to the passerby who may reject it or accept it, and who thereafter may keep it, dispose of it properly, or incur the risk of punishment if he lets it fall to the ground."). It does not prohibit citizens from exercising their right "to distribute literature in the same place" where the ban on placing leaflets on car windshields exists—namely, by waiting in a parking lot or on a street and asking the owners of a car whether they would like a leaflet or a sign for their car. *Id.* at 812 (The "ordinance does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited."). It does not prohibit citizens from going door-to-door to talk to residents about the message they wish to share and expressly permits them to give homeowners a pamphlet if they are "handed in at the door." § 113.03. It does not prohibit citizens from mailing information to residents. *See Council of Greenburgh*, 453 U.S. at 114. And it expressly allows citizens to leave leaflets and pamphlets at private residences if they are "placed on a porch[] or securely fastened to prevent [them] from being blown or scattered about." § 113.03. By any measure of alternative channels of communication, the City of Catlettsburg has given its citizens numerous ways to distribute literature and information in an inexpensive, efficient and productive manner.

## III.

Jobe attempts to counter these conclusions with a series of additional arguments that we have not yet fully accounted for or otherwise addressed in our affirmative presentation. He initially protests that Catlettsburg should control littering by punishing "those who actually throw papers on the streets" rather than those who distribute the leaflets. *Schneider*, 308 U.S. at 162. Unlike *Schneider*, however, littering and visual blight are not the only concerns that support this ordinance. The law also protects the private property of the city's residents and prohibits their cars from being converted into mailboxes or bulletin boards. Placing unrequested leaflets on privately owned cars, moreover, amounts to a form of littering no less than placing leaflets on privately owned lawns or directly on the public streets. There is nothing special about a car—or, for that matter, about a bicycle, a baby stroller, an individual's back or a lawn—that invites others to place leaflets or advertisements on it without the owner's consent. And although the "short, though regular, journey from mail box to trash can . . . is an acceptable burden," to place on mailbox owners, *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983) (striking a content-based statute prohibiting mailing unsolicited advertisements for contraceptives), that burden stems from an individual's choice to erect a mail box, *see Council of Greenburgh*, 453 U.S. at 125 ("Anyone is free to live in any part of the country without having letters or packages delivered or received by the Postal Service by simply failing to provide the receptacle for those letters and packages which the statutes and regulations require."). In marked contrast, parking a car on a public street is not an invitation to place literature on the car or, worse, to become a vehicular sandwich board for another citizen's message of the day.

Neither is it clear that Jobe's conduct may fairly be described as leafletting, as opposed to littering, at least so far as the Supreme Court has described leafletting. "The right recognized in *Schneider*," the Court has explained, "is *to tender* the written material to the passerby *who may reject it or accept it*." *Taxpayers for Vincent*, 466 U.S. at 809–10 (emphasis added). Unlike traditional leafletting, the recipient of an advertisement or other pamphlet on a car windshield has no choice in receiving the literature, no choice in accepting the burden of disposing of it and no choice in peeling it off the windshield after a rain shower. *See Schneider*, 308 U.S. at 162 (discussing "handing literature to one willing to receive it"); *see also Hill*, 530 U.S. at 727 ("And, as in all leafleting situations, pedestrians continue to be free to decline the tender."); *id.* at 718

("[O]ur cases have repeatedly recognized the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure.") (quotations omitted); *Taxpayers for Vincent*, 466 U.S. at 806 n.24 (noting that "the passer-by who may be offered a pamphlet in the street [ ] *cannot be made to take it*") (emphasis added); *Watchtower Bible & Tract Soc'y of New York*, 536 U.S. at 168 (noting that "the resident's *unquestioned right to refuse* to engage in conversation with unwelcome visitors[] provides ample protection for the unwilling listener") (emphasis added).

Jobe next argues that the ordinance is not narrowly tailored because (1) it fails to account for drivers who want to receive leaflets and (2) it permits drivers to give only written consent, as opposed to oral consent, to receive leaflets. Yet the ordinance does account for willing car owners: It permits leafletting on the cars of those who give the leafletter permission. § 113.05 (permitting anyone to place leaflets on a vehicle after "having secured in writing the consent of the owner"). Nothing in the ordinance prohibits willing recipients from indicating in writing to Jobe or other passersby that they invite leaflets to be placed under the windshield wipers of their cars. The ordinance simply accounts for what has long been a central feature of traditional leafletting—the opportunity of the recipient to either accept or reject the offered literature—an opportunity denied to car owners who have not invited the leaflets. *See Taxpayers for Vincent*, 466 U.S. at 809–10. Nor, as a practical reality, is it apparent how the city has needlessly burdened free expression by requiring vehicle owners to give *written* authorization to receive leaflets and advertisements on their cars. Any car owner who would otherwise be available to give *oral* permission to receive, say, leaflets placed under a windshield wiper would otherwise be available to accept the leaflet directly.

Far from improperly interfering with private property, Jobe next argues that his method of distributing American Legion literature and advertisements parallels other age-old methods of distributing information through the private property of others—using a door slot or a door knob to deliver a leaflet to a homeowner, using an answering machine to deliver a voice message, using a private mailbox to deliver a stamped advertisement or using a computer to deliver an electronic message. In attempting to analogize his actions to these methods of communication, however, he neglects a salient distinction: A windshield wiper is not a communications device and has never taken on the trappings of one. While Mary Anderson may be given credit for inventing the windshield wiper, she has never been given credit for devising a means of communication. And when Robert Kearns sought to improve the device (by inventing the intermittent windshield wiper), *see Kearns v. Wood Motors, Inc.*, 773 F. Supp. 979 (E.D. Mich. 1990), we suspect that he gave little thought to enhancing its ability to accept and secure leaflets. Unlike a telephone, a mailbox, a computer or the well-trodden path to the front door, the windshield wiper does not exist, formally or informally, to encourage communication. *Compare Breard*, 341 U.S. at 626 ("It is true that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers."). In the setting of property that has a tradition of being used to receive and initiate communications, it may make abundant sense under the First Amendment to place the burden on the property owner to remove the slot on the door, to remove the mailbox, *see Greenburgh*, 453 U.S. at 125, to sign onto a do-not-call or a do-not-spam list, or to place a "No Solicitation" sign on the door. It would make considerably less sense to put the vehicle owner to the choice of accepting either a ridiculous requirement (removing the windshield wipers) or an unorthodox burden (placing a "No Handbills, No Posters . . ." sign on the dashboard).

Even so, Jobe counters, the ordinance does not leave open ample alternative channels because "the unique efficiency of leafletting cars downtown cannot be replicated [ ] by driving door to door throughout a rural county, by hand-delivering to people as they walk by, or by leafleting drivers." Jobe Br. at 6. "To the contrary," he continues, "the only efficient and effective way to leaflet those who come to town (residents and visitors) is to leaflet cars that congregate in a finite area." *Id.* Jobe has a fair point here because the Supreme Court in fact has been quite sensitive to the need to permit inexpensive methods of spreading ideas and information. *See Gilleo*, 512 U.S.

at 57 (striking ordinance that prevented homeowners from displaying signs in their own windows and commenting that "[r]esidential signs are an unusually cheap and convenient form of communication"); *Martin*, 319 U.S. at 146 ("Door to door distribution of circulars is essential to the poorly financed causes of little people."); *Watchtower Bible & Tract Soc'y of New York*, 536 U.S. at 162 ("[P]erhaps the most effective way of bringing [pamphlets] to the notice of individuals is their distribution at the homes of the people.") (quoting *Schneider*, 308 U.S. at 164).

But "[a]lthough the Court has shown special solicitude for forms of expression that are much less expensive than feasible alternatives and hence may be important to a large segment of the citizenry, this solicitude has practical boundaries." *Taxpayers for Vincent*, 466 U.S. at 812 n.30 (citations omitted). "That more people may be more easily and cheaply reached by sound trucks," the Court has noted, "is not enough to call forth constitutional protection for what those charged with public welfare may reasonably think is a nuisance when easy means of publicity are open." *Kovacs v. Cooper*, 336 U.S. 77, 88–89 (1949); *see also Taxpayers for Vincent*, 466 U.S. at 812 n.30 (citing *Metromedia*, 453 U.S. at 549–50 (Stevens, J., dissenting in part), for the proposition that a "ban on graffiti [was] constitutionally permissible even though some creators of graffiti may have no equally effective alternative means of public expression"). Likewise, even though the appellees in *Council of Greenburgh* claimed that "receptacles for mailable matter are so superior to alternative efforts to communicate printed matter that all other alternatives for deposit of such matter are inadequate substitutes for postal letterboxes," 453 U.S. at 124, the Court determined that mailboxes were not public fora and so permitted the ban. In the end, the fact that a means of communication is efficient and inexpensive does not automatically trump other government interests. At some point, the very cheapness of a mode of communication may lead to its abuse. As the Court explained in *Taxpayers for Vincent*: "A distributor of leaflets has no right simply to scatter his pamphlets in the air—or to toss large quantities of paper from the window of a tall building or a low flying airplane. Characterizing such an activity as a separate means of communication does not diminish the State's power to condemn it as a public nuisance." 466 U.S. at 809.

Jobe, finally, argues that we should follow the Eighth Circuit's lead in *Krantz v. City of Fort Smith*, 160 F.3d 1214 (8th Cir. 1999), which invalidated a similar ordinance. We decline to do so. As an initial matter, we must acknowledge that this case likely would have come out differently had we followed *Krantz*. While the ordinance at issue in that case did not prohibit individuals from attaching or affixing posters and advertisements to cars, as the Catlettsburg ordinance does, it did prohibit individuals from placing the literature on a car (e.g., under the car windshield wipers), just as the Catlettsburg ordinance does. And while the ordinance at issue in *Krantz* involved the distribution of religious literature, the scant record in this case permits the inference (which Jobe claims to be accurate) that his distribution of fliers on behalf of the American Legion will involve commercial and political speech. *See* JA 6. So even on the assumption that a different analysis would apply if Jobe's activities involved only commercial speech, an assumption that we do not necessarily accept, *see Discovery Network*, 507 U.S. at 424 (striking ordinance that banned the placement on public streets of newsracks containing commercial, but not non-commercial, handbills), the subject matter of the speech at issue does not provide a basis for distinguishing the one case from the other.

At the end of the day, we disagree with three facets of the *Krantz* analysis. One, even though the *Krantz* district court stated that "these ordinances regulate the conduct of littering—the physical act of throwing down or depositing a piece of paper on public or private property," *Krantz*, 160 F.3d at 1216 (quoting the district court), the Eighth Circuit chose to decide the case on the assumption (never explained) that the placing of handbills on cars is not littering. *Id.* at 1221. We cannot accept that premise. Placing unrequested fliers on a car windshield (or some other part of the car) shares as many qualities with littering as placing the fliers on the front lawn of a residence, on the top of a boat or for that matter on top of any piece of private property that is not otherwise designed by intent or usage to receive and hold literature distributed by others.

Two, so far as the opinion shows, *Krantz* did not address *Taxpayers for Vincent*, much less distinguish the decision. That perhaps explains the Eighth Circuit's conclusions (1) that the public-forum doctrine governed the case and (2) that the ordinance was not narrowly tailored. *Krantz*, 160 F.3d at 1218–19. As we have shown, *Taxpayers for Vincent* (and before that, *City of Greenburgh*) established that not all items that appear on public streets are transformed into public fora. If public utility poles and private mailboxes located on public streets and sidewalks are not public fora, neither is a car windshield. And consistent with *Taxpayers for Vincent*, the Catlettsburg ordinance prohibits only the discrete problems it targets—littering on cars and the unauthorized use of private property to distribute or display a message—which is the pinnacle of narrow tailoring. *See* 466 U.S. at 810.

Three, *Krantz* in our view fails to account for the fundamental difference between traditional leafletting and the activities of Jobe and Krantz. Neither by tradition nor by design does the car windshield occupy a place in the long-accepted traditions of leafletting—whether hand-to-hand on public sidewalks or door-to-door in the neighborhood—or otherwise amount to a long-accepted communicative tool that governments may regulate only with the utmost care. And unlike traditional leafletting, Jobe's and Krantz's activities do not readily allow the recipient to opt out of receiving the flier and to opt out of the responsibility for disposing of it. While *Krantz* perhaps makes the best case for invalidating an ordinance like this one, it is not an analysis that we can accept.

IV.

For these reasons, we affirm.

Appendix

State law:

New York          New York, N.Y. Veh. & Traf. Law § 375(b) (2005)

(b) Every such motor vehicle shall be equipped with suitable wipers or other device which shall clear a sufficient area of the windshields to provide reasonable driving vision.

(i) The use or placing of posters or stickers on windshields or rear windows of motor vehicles other than those authorized by the commissioner, is hereby prohibited. In a city of one million or more, there shall be a rebuttable presumption that the person whose name, telephone number, or other identifying information appears on any handbill or other form of advertisement attached to a windshield or windshield wipers of a motor vehicle shall be in violation of the provisions of this subdivision relating to the prohibition against attaching to windshields and windshield wipers, handbills and other forms of advertisements.

. . .

(iii) . . . The attaching to windshields and windshield wipers of handbills and other forms of advertisements, is hereby prohibited.

Territory law:

Virgin Islands          19 V.I. Code Ann. § 1563(10)  (2004)

No person shall—

. . .

(10) place or deposit any commercial or non-commercial handbill upon any vehicle not his own or in his possession.

City ordinances:

Albany          Albany, Ga., Code of Ordinances, § 3.22 (2004)
It shall be unlawful for any person to throw or deposit any handbill in or upon any vehicle without the owner's consent.

Atlanta          Atlanta, Ga., Code of Ordinances, § 6-2 (2005)
Sec. 6-2.  Placing advertising matter in or upon motor vehicles.
It shall be unlawful for any person, without the consent of the owner or person in charge of a motor vehicle which is parked on a public street, to place on or inside that parked motor vehicle any placard, handbill, card or advertising matter.

Beach Park          Beach Park, Ill., Municipal Code, § 9.20.110 (2003)
9.20.110.  Distribution of handbills on streets or vehicles.
No person shall distribute, cast, throw or place in or upon or along any of the streets, alleys or private places, whether upon any public place or upon any private property in the village, any handbills, pamphlets, circulars, books or advertising for the purposes or with the intent of advertising or making known any business, occupation, profession, medical treatment, medicine or any thing whatsoever.

Bullhead City          Bullhead City, Ariz., Municipal Code, § 9.12.070 (A) (2005)
9.12.070.  Handbills.
A. It is unlawful for any person to deposit, place or throw any handbill in or upon any city street or park, or upon an automobile or other vehicle located within the city, or to deposit, place or throw any handbill in or upon any other public place, except for handbills handed directly to a person who consents to receiving such handbill.

| | |
|---|---|
| Calexico | Calexico, Cal., Municipal Code, § 5.56.120 (2004)<br>Sec. 5.56.120. Distribution in or upon vehicles prohibited—Exception.<br>It is unlawful for any person to distribute, deposit, place, throw, scatter or cast any commercial handbill in or upon any automobile or other vehicle. The provisions of this section shall not be deemed to prohibit the handing, transmitting or distributing of any noncommercial handbill to the owner or other occupant of any automobile or other vehicle who is willing to accept the same. |
| Carlsbad | Carlsbad, Cal., Municipal Code, § 8.28.055(a) (2005)<br>Sec. 8.28.055. Depositing handbills on vehicles in parking lots prohibited.<br>(a) It is unlawful for any person to place, throw or deposit any handbill in or upon any vehicle in a public parking lot or to place, throw or deposit any handbill in or upon any vehicle in a private parking lot without the written permission of the owner, or the person entitled to immediate possession, or the authorized agent of either. Said written permission shall be presented to a peace officer upon request. |
| Carpinteria | Carpinteria, Cal., Municipal Code, § 9.20.030 (2005)<br>9.20.030. Placing in or on vehicles prohibited when.<br>No person shall throw, distribute, or place in or on any automobile or other vehicle in the city, any handbills, dodgers, circulars, newspapers, papers, booklets, posters, or any other printed matter or advertising literature without first having obtained the permission of the owner or person in possession thereof. |
| Cathedral City | Cathedral City, Cal., Municipal Code, § 5.20.050 (2004)<br>5.20.050 Placing commercial handbills in or on vehicles prohibited.<br>No person shall distribute, deposit, place, throw, scatter or cast any commercial handbill in or upon any automobile or other vehicle. |
| Charlotte | Charlotte, N.C., Charter and Code of Ordinances, § 15-1(b) (2004)<br>Sec. 15-1. Distribution of handbills, advertisements, letters, pamphlets or other materials.<br>(b) It shall be unlawful for any person to deposit in, paste on, or attach to any motor vehicle any handbills, advertisements, cards, circulars, leaflets, folders, banners, letters or pamphlets or to cause such materials to be deposited in, pasted on or attached to any motor vehicle, without the consent of the owner. Nothing contained in this subsection shall prohibit the attachment to a motor vehicle of a citation or public safety information issued or published by or on behalf of the city. |
| Cheyenne | Cheyenne, Wy., City Code, § 8.52.070 (2005)<br>Section 8.52.070. Unlawful, depositing on uninhabited or vacant premises—Placing on vehicles.<br>Throwing or depositing of handbills upon uninhabited or vacant private premises is not allowed, nor shall any person throw or deposit any handbill in or upon any motor vehicle. |
| Chino | Chino, Cal., Municipal Code, § 9.64.030(A) (2005)<br>9.64.030. Distribution of handbills and/or samples on motor vehicles strictly prohibited.<br>A. Any person who places, or allows, directs or causes another to place, handbills in or about any motor vehicle shall be guilty of a misdemeanor. |
| Cleveland | Cleveland, Oh., Charter & Codified Ordinances, § 613.12 (2004)<br>Section 613.12. Placing Commercial and Noncommercial Handbills on Vehicles<br>No person shall throw or deposit any commercial or noncommercial handbill in or upon any vehicle. However, it shall not be unlawful in any public place unless specifically prohibited by the controlling governmental agency for a person to hand out or distribute without charge to the receiver thereof, a noncommercial handbill to any occupant of a vehicle who is willing to accept it. |
| Coachella | Coachella, Cal., Municipal Code, § 5.32.110 (2003)<br>5.32.110. Placing handbills in and on vehicles.<br>It is unlawful for any person to distribute, deposit, place, throw, scatter or cast any handbill in or upon any automobile or other vehicle. |

| | |
|---|---|
| Commerce City | Commerce City, Colo., Code of Ordinances, § 13-12(b) (2005)<br>Sec. 13-12. Placement of advertisements and other printed materials.<br>(b) Any handbill, poster, placard or printed material placed under windshield wipers or affixed to a vehicle without the permission of the owner, agent or occupant of the vehicle shall be deemed a nuisance. |
| Cotati | Cotati, Cal., Municipal Code, § 9.48.020 (2004)<br>9.48.020. Vehicles.<br>No person shall throw or deposit any commercial or noncommercial handbill in or upon any vehicle. Provided, however, that it is not unlawful in any public place for a person to hand out or distribute without charge to the receiver thereof a noncommercial handbill to any occupant of a vehicle who is willing to accept it. |
| Duarte | Duarte, Cal., Municipal Code, § 5.32.130 (2005)<br>5.32.130. Distribution on motor vehicles.<br>No person shall distribute, or cause to be distributed, any advertising matter by placing the same in or upon any motor vehicle, as that phrase is defined in the Vehicle Code of the state, which is parked upon any public street, alley or public parking area, or upon any such vehicle parked upon any private property. |
| El Monte | El Monte, Cal., Municipal Code, § 9.04.060 (2004)<br>Sec. 9.04.060. Handbills.<br>No person shall place or affix any commercial advertising handbill, leaflet, dodger or other printed commercial advertisement of any kind on any vehicle parked in any public place or parked on any privately owned parking lot open to the public without the express written consent of the owner or person in lawful possession of the vehicle or property. |
| Escondido | Escondido, Cal., Municipal Code, § 16-96 (2005)<br>Sec. 16-96. Manner of distributing handbills.<br>No handbill or advertising shall be thrown, placed or distributed upon any yards, sidewalks, automobiles, streets, parking lots or elsewhere so as to litter or make untidy any such place. |
| Fillmore | Fillmore, Cal., Municipal Code, § 15.20.030 (2004)<br>15.20.030. Placing in vehicles.<br>It is unlawful for any person, either directly or indirectly, to distribute, deposit, place, throw, scatter or cast, any handbill in or upon any automobile or other vehicle; the provisions of this section shall not be deemed to prohibit the handing, transmitting or distributing of any handbill to the owner or other occupant of any automobile or other vehicle. |
| Flagstaff | Flagstaff, Ariz., City Code, § 6-06-001-0008(C) (2002)<br>Section 6-06-001-0008. Posting of Handbills on Public and Private Property<br>C. Vehicles: No Person shall deposit any Handbill upon any vehicle on a Public Place without the express consent of the owner or person in control of such vehicle. |
| Gardena | Gardena, Cal., Municipal Code, § 12.08.020 (2004)<br>Sec. 12.08.020. Distribution of advertising.<br>It is unlawful for any person to cast, scatter and strew, i.e. litter, in the city to or among any other persons in, along, or upon any public street, highway, alley, park, depot or any other public place or into or upon any automobile or other vehicle or conveyance of another person or into or upon any mailbox, porch, yard or any portion of any premises within the city any handbill, poster, dodger, pamphlet or paper containing printed or typewritten matter or advertising or other notice or advertisement. |
| Glendora | Glendora, Cal., Municipal Code, § 5.16.040 (2004)<br>5.16.040. Putting handbills in vehicles.<br>It is unlawful for any person to distribute, deposit, place, throw, scatter or cast any commercial or noncommercial handbill in or upon any automobile or other vehicle. |
| Huntington Park | Huntington Park, Cal., Municipal Code, § 5-1.03 (2003)<br>Sec. 5-1.03. Putting handbills in or on vehicles.<br>(a) No person, either directly or indirectly, shall distribute, deposit, place, throw, scatter or cast any handbill in or upon any automobile or other vehicle. |

| | |
|---|---|
| Jersey City | Jersey City, N.J., Municipal Code, § 81-10 (2005)<br>§ 81-10. Placing handbills in or upon vehicles prohibited.<br>It shall be unlawful for any person to distribute, deposit, place, throw, scatter or cast any handbill in or upon any automobile or other vehicle. The provisions of this section shall not be deemed to prohibit the handing, transmitting or distributing of any handbill to the owner or other occupant of any automobile or other vehicle who is willing to accept the same. |
| La Habra | La Habra, Cal., Municipal Code, § 5.12.040 (2005)<br>5.12.040. Placing in or upon vehicles.<br>It is unlawful for any person to distribute, deposit, place, throw, scatter or cast any commercial or noncommercial handbill in or upon any automobile or other vehicle. |
| La Mesa | La Mesa, Cal., Municipal Code, § 10.12.030 (2005)<br>10.12.030. Automobiles.<br>No person shall throw, distribute, or place in or on any automobile or other vehicle in the City any handbill, dodger, circular, newspaper, paper, booklet, poster, or any other printed matter, advertising literature or product without first having obtained the permission of the owner or person in possession thereof. |
| La Plata | La Plata, Md., Municipal Code, § 132-10 (2005)<br>Section 132-10. Distribution of handbills.<br>B. Placing commercial and noncommercial handbills on vehicles. No person shall throw or deposit any commercial or noncommercial handbill in or upon any vehicle; provided, however, that it shall not be unlawful in any public place for a person to hand out or distribute without charge to the receiver thereof a noncommercial handbill to any occupant of a vehicle who is willing to accept it. |
| Las Vegas | Las Vegas, Nev., Municipal Code, § 6.42.145 (2005)<br>6.42.145. Distribution on or in motor vehicles.<br>(A) No person shall deposit, fasten, throw, scatter, cast or place any commercial or noncommercial handbill:<br>(1) In or upon any vehicle that is parked on any public street or on any property that is owned by the City; or<br>(2) In or upon any vehicle parked in or upon any private property that provides multiple spaces for parking vehicles. Such property shall, without limitation, include such locations as parking garages, shopping centers, shopping malls, outdoor theaters, drive-in restaurants, gasoline service stations, apartment and housing developments and complexes, casino and other types of parking lots and any other place where provision is made for vehicles to stop or park in designated areas for any purpose.<br>(B) The provisions of Paragraphs (1) and (2) of Subsection (A) of this Section shall not be deemed to prohibit in any public or private place the distribution of any commercial or noncommercial handbill by hand delivery to the owner or other occupant of any vehicle who is willing to accept the handbill without payment therefor. |
| Madison | Madison, Wis., Code of Ordinances, § 23.04 (2004)<br>23.04. Distribution of Commercial and Advertising Matter Prohibited.<br>(2) It shall be unlawful for any person, firm, or corporation, except the owner, to place or cause to be placed in or upon any automobile standing on the streets, alleys, or public places in the City of Madison for advertising purposes any commercial, dodger, card, pamphlet, sticker, tag, or paper of any kind. |
| Menlo Park | Menlo Park, Cal., Municipal Code, § 8.36.010 (2005)<br>8.36.010. Distributing on streets and automobiles.<br>Except as provided hereafter, no person shall, upon any public street, parking plaza, sidewalk or park, deposit or place on vehicles any handbill or any other type of printed or written advertisement. This section shall not prohibit the distribution of written or printed matter devoted to the expression of views, opinions, beliefs or contentions relating to religious or political subjects, or to public or civic affairs, or which treats of any social or economic order, or which is aimed at the redress of any grievance, or which otherwise is not distributed for the purpose of soliciting business or trade. |

Mishawaka     Mishawaka, Ind., Code, § 110.05 (2005)
§ 110.05. Placing Posters on Vehicles.
It shall be unlawful for any person to place or deposit or in any manner to affix or cause to be placed or deposited or affixed to any automobile or other vehicle or other automotive vehicle, any handbill, sign, poster, advertisement, or notice of any kind whatsoever not provided by law, unless he be the owner thereof, or without first having secured in writing the consent of the owner thereof.

Mundelein     Mundelein, Ill., Municipal Code, § 9.56.060 (2005)
9.56.060.  Handbill distribution.
(b) Placing on Vehicles. No person shall place or deposit any commercial or noncommercial handbill in or upon any vehicle while such vehicle is parking or standing on any street or other public place within the village. It is not unlawful in any public place within the village for a person to hand out or distribute without charge to the receiver thereof, a noncommercial handbill to any occupant of a vehicle who is willing to accept it.

Nashville     Nashville & Davidson County, Tenn., Charter and Related Private Laws and Code of Laws of the Metropolitan Government of Nashville and Davidson County, Tennessee, § 10.24.040 (2005)
10.24.040.  Handbills--Distribution on vehicles.
No person shall throw or deposit any commercial or noncommercial handbill in or upon any vehicle. Provided, however, that it is not unlawful in any public place for a person to hand out or distribute to the receiver thereof, a commercial or noncommercial handbill to any occupant of a vehicle who is willing to accept it.

Quincy     Quincy, Mass., Municipal Code, § 9.12.020 (2003)
Section 9.12.020. Advertisements—Distribution.
No person shall distribute or circulate, or cause to be distributed or circulated, any handbills, cards, posters or flyers in or upon any public street, way or place of the city by placing the same in or upon any automobile or other vehicle standing in any such street, way or place, except upon permission duly granted in writing by the chief of police. A copy of such handbill, card, poster or flyer so proposed to be distributed or circulated shall accompany the application for such permit, and no such permit shall be construed to allow the throwing or scattering of such handbills, cards, posters or flyers in or upon the streets named in the permit.

Petersburg     Petersburg, Alaska, Municipal Code, § 9.12.150 (2005)
9.12.150.  Handbills—Placing on vehicles prohibited.
No person shall throw or deposit any commercial or noncommercial handbill in or upon any vehicle; provided, however, that it is not unlawful in any public place for a person to hand out or distribute without charge to the receiver thereof, a noncommercial or commercial handbill to any occupant of a vehicle who is willing to accept it.

Philadelphia     Philadelphia, Penn., Code of Ordinances §  10-711 (2005)
§10-711.   Placing Commercial and Non-Commercial Handbills on Vehicles.
(1)  No person shall place or deposit any commercial or non-commercial handbill in or upon any vehicle; provided, that it shall not be unlawful for any person to distribute, without charge, a non-commercial handbill to any occupant of a vehicle who is willing to accept it.

Portland     Portland, Or., City Code § 16.70.510 (2005)
A.  It is unlawful for any person to ride or trespass upon or within any motor vehicle without the consent of the owner or operator thereof.
B.  It is unlawful for any person to post, stick, or place upon or within any motor vehicle any card, notice, handbill, leaflet, pamphlet, survey, or similar matter without the consent of the owner or operator.
C.  The provisions of this Section do not apply to any card, notice, handbill, leaflet, pamphlet, survey, or similar matter placed upon or within such motor vehicle by authority of law, by an authorized officer of the City, County, or State or by a designee of the City Traffic Engineer.

San Antonio          San Antonio, Tex., Charter and Code of Ordinances,§ 21-5 (2004)
                     Sec. 21-5. Throwing handbills in parked vehicles.
                     It shall be unlawful for any person to throw, place or deposit, or cause to be thrown, placed or
                     deposited, any circular, dodger, handbill or other advertising or printed matter of any character
                     whatsoever, in or on any vehicle parked or standing upon or along any street or other public place
                     within the city, without the express consent and permission of the owner or person in charge of
                     the vehicle.